POMERANTZ LLP
Gustavo F. Bruckner
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREW J. KORNECKI, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | <u>CLASS ACTION COMPLAINT</u> |
| v. | <u>JURY TRIAL DEMANDED</u> |
| AIRBUS SE, GUILLAUME M.J.D. FAURY, TOM ENDERS, DOMINIK ASAM, and HARALD WILHELM, | |
| Defendants. | |

Plaintiff Andrew J. Kornecki ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other

matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Airbus SE ("Airbus" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Airbus securities in the U.S. between February 24, 2016, and July 30, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Airbus was founded in 2000 and is based in Leiden, the Netherlands. The Company is a multinational aerospace corporation, operating through its

Commercial Aircraft, Defense and Space, and Helicopters divisions. The Company's American Depository Receipts ("ADRs") trade in the U.S. on the over-the-counter market (the "OTC") under the ticker symbol "EADSY," and the Company's foreign ordinary shares ("foreign ordinaries") trade in the U.S. on the OTC under the ticker symbol "EADSF."

3. In August 2012, the United Kingdom ("U.K.") Serious Fraud Office ("SFO") announced that it had opened a formal criminal investigation into one of Airbus's subsidiaries, GPT Special Project Management Ltd. ("GPT"), which Airbus acquired in 2007. The allegations called into question a service contract entered into by GPT prior to its acquisition by Airbus, relating to activities conducted by GPT in Saudi Arabia.

4. Unbeknownst to investors and the public, however, Airbus was at an increased and foreseeable risk of facing significant potential liabilities for other alleged illegal activities that would later be investigated by governmental authorities around the world. These activities, combined with the investigation into GPT, implicated all three of Airbus's divisions, calling into question the sustainability of the Company's reported earnings during the Class Period.

5. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading

statements and/or failed to disclose: (i) that Airbus's policies and protocols were insufficient to ensure the Company's compliance with relevant anti-corruption laws and regulations; (ii) that, consequently, Airbus engaged in bribery, corruption, and fraud in order to enhance its business with respect to its commercial aircraft, helicopter, and defense deals; (iii) that, as a result, Airbus's earnings were derived in part from unlawful conduct and therefore unsustainable; (iv) the full scope and severity of Airbus's misconduct; (v) that resolution of government investigations of Airbus would foreseeably cost Airbus billions of dollars in settlements and legal fees and subject the Company to significant continuing government investigation and oversight; and (vi) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

6.     On August 8, 2016, *Reuters* reported that the U.K. had opened a corruption probe into Airbus.  Specifically, the SFO announced that it had "opened a criminal investigation into allegations of fraud, bribery and corruption in the civil aviation business of Airbus," which "relate to irregularities concerning third party consultants."  The investigation followed Airbus's flagging of "misstatements and omissions" involving outside contractors in certain export financing applications to U.K. regulators and the European Export Credit Agencies earlier in the year, which the Company had found through an internal probe.

4

7.      On this news, Airbus ADRs fell $0.21 per share, or 1.49%, to close at $13.86 per share on August 8, 2016, and Airbus foreign ordinaries fell $0.82 per share, or 1.45%, to close at $55.58 per share on August 8, 2016.

8.      France and the U.S. later opened their own investigations into the subject of the SFO's allegations in 2017 and 2018, respectively.  On January 31, 2020, media outlets reported that Airbus had agreed to a deal with U.S., U.K., and French prosecutors to settle bribery and export-control violations against the Company for €3.6 billion ($4 billion).  Pursuant to the settlement, Airbus also agreed to appoint an external compliance officer for at least two years to monitor the Company's handling of its defense-related sales and disclosures.

9.      On this news, Airbus ADRs fell $0.72 per share, or 1.93%, to close at $36.68 per share on January 31, 2020, and Airbus foreign ordinaries fell $2.21 per share, or 1.48%, to close at $147.00 per share on January 31, 2020.

10.     Then, on March 15, 2020, the *Wall Street Journal* reported that Airbus executives had previously raised red flags about fees paid to a number of middlemen working with its helicopter division, led at the time by the Company's current Chief Executive Officer ("CEO"), Defendant Guillaume M.J.D. Faury ("Faury"),  that may have violated global bribery and corruption rules, according to internal documents related to Airbus's $4 billion bribery settlement, which were not previously made public and/or reported.

5

11.     On this news, Airbus ADRs fell $3.44 per share, or 15.71%, to close at $18.46 per share on March 16, 2020, and Airbus foreign ordinaries fell $7.97 per share, or 9.3%, to close at $77.75 per share on March 16, 2020.

12.     Finally, on July 30, 2020, the *Wall Street Journal* reported that the SFO had charged GPT and three individuals with corruption in connection with a defense contract the U.K. had arranged with Saudi Arabia.   These charges were the culmination of the investigations initiated by the SFO back in August 2012.

13.     On this news, Airbus ADRs fell $0.67 per share, or 3.56%, to close at $18.13 per share on July 31, 2020, and Airbus foreign ordinaries fell $2.85 per share, or 3.8%, to close at $72.10 per share on July 31, 2020.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

17.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.   Pursuant to Airbus's most recent annual report, the Company had a weighted average number of 777,039,858 shares outstanding during the year 2019. Airbus's shares trade in the U.S. on the OTC.   Accordingly, there are presumably hundreds, if not thousands, of investors in Airbus's shares located within the U.S., some of whom undoubtedly reside in the State of New Jersey.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.     Plaintiff, a U.S. resident, acquired Airbus securities in the U.S. at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.   The attached Certification sets forth Plaintiff's Class Period transactions.

20.     Defendant Airbus is a Netherlands corporation with principal executive offices located Mendelweg 30, Leiden 2333 CS, Netherlands.   The Company's ADRs trade in the U.S. on the OTC under the ticker symbol "EADSY," and the

Company's foreign ordinaries trade in the U.S. on the OTC under the ticker symbol "EADSF".

21.     Defendant Faury has served as Airbus's CEO and Executive Director since April 2019.

22.     Defendant Tom Enders ("Enders") served as Airbus's CEO and Executive Director from before the start of the Class Period until April 2019.

23.     Defendant Dominik Asam ("Asam") has served as Airbus's Chief Financial Officer ("CFO") since April 2019.

24.     Defendant Harald Wilhelm ("Wilhelm") served as Airbus's CFO from before the start of the Class Period until April 2019.

25.     Defendants Faury, Enders, Asam, and Wilhelm are sometimes referred to herein collectively as the "Individual Defendants."

26.     The Individual Defendants possessed the power and authority to control the contents of Airbus's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Airbus's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Airbus, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to

and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

27.    Airbus and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.    Airbus was founded in 2000 and is based in Leiden, the Netherlands. The Company is a multinational aerospace corporation, operating through its Commercial Aircraft, Defense and Space, and Helicopters divisions.

29.    In August 2012, the SFO announced that it had opened a formal criminal investigation into one of Airbus's subsidiaries, GPT, which Airbus acquired in 2007.  The allegations called into question a service contract entered into by GPT prior to its acquisition by Airbus, relating to activities conducted by GPT in Saudi Arabia within the context of a global trade in weapons and defense equipment. Specifically, three whistleblowers alleged that, as part of a £2 billion government-to-government deal for communication and surveillance equipment for the Saudi Arabian national guard, at least £14.5 million in suspicious payments were made from 2007 and 2010 to two companies based in the Cayman Islands.   The

whistleblowers claimed the companies received 14% of the equipment budget on the contract yet provided no goods or services.

30.     Unbeknownst to investors and the public, however, Airbus was also at an increased and foreseeable risk of facing significant potential liabilities for other alleged illegal activities that would later be investigated by governmental authorities around the world.  These activities, combined with the investigation into GPT, implicated all three of Airbus's divisions, calling into question the sustainability of the Company's reported earnings during the Class Period.

### Materially False and Misleading Statements Issued During the Class Period

31.     The Class Period begins on February 24, 2016, when Airbus issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2015.  That press release reported, in relevant part:

> Group **revenues** increased six percent to € 64.5 billion (2014: € 60.7 billion). This was mainly driven by Commercial Aircraft which registered an eight percent rise in revenues on higher deliveries of 635 aircraft (2014: 629 units), including 14 A350 XWBs, and the strengthening U.S. dollar. Despite lower overall deliveries of 395 units (2014: 471 units), Helicopters' revenues rose four percent and mainly reflected a higher level of services activities. Defence and Space's revenues were broadly stable despite the de-consolidation of launcher revenues with the creation of the Airbus Safran Launchers Joint Venture's first phase. A total of 11 A400M military transport aircraft were delivered in 2015.

* * *

> **Net income[] and earnings per share** (EPS) increased 15 percent to € 2,696 million (2014: € 2,343 million) and € 3.43 (2014: € 2.99)

respectively. The finance result was € -687 million (2014: € -778 million) and included one-offs totalling € -218 million, mainly from a negative foreign exchange revaluation. 2015 net income and EPS were positively influenced by a lower effective tax rate following tax reduced capital gains from divestments.

32.    Thereafter, and prior to its Annual General Meeting, Airbus issued its Annual Report for the year ended December 31, 2015 (the "2015 Annual Report"). With respect to the SFO's investigation into GPT's activities in Saudi Arabia, the 2015 Annual Report stated, in relevant part, that, "[p]rompted by a whistleblower's allegations, Airbus Group conducted internal audits and retained PricewaterhouseCoopers ('PwC') to conduct an independent review relating to GPT"; that "[t]he allegations called into question a service contract entered into by GPT prior to its acquisition by Airbus Group, relating to activities conducted by GPT in Saudi Arabia"; that "PwC's report was provided by Airbus Group to the [SFO] in March 2012"; that, "[i]n the period under review and based on the work it undertook, nothing came to PwC's attention to suggest that improper payments were made by GPT"; that, "[i]n August 2012, the SFO announced that it had opened a formal criminal investigation into the matter"; and that "Airbus Group is cooperating fully with the authorities."

33.    In discussing anti-corruption laws and regulations, the 2015 Annual Report represented, in relevant part, that "[t]he Company seeks to comply with all applicable anti-bribery laws and regulations and is fully committed to preventing

corruption in all operations conducted by the Company or by third parties acting on its behalf"; that "an anti-corruption programme has been put in place to ensure adequate identification, assessment, monitoring and control of corruption risks"; that "[t]his programme oversees business development activities and various other operations such as mergers and acquisitions, financial investments or procurement activities"; that "[t]he anti-corruption programme ensures a long-term view on the evolution of the corruption risk and continuously updates and, as the case may be, reinforces the Company controls and procedures to prevent corruption while aiming at ensuring business success"; that "[t]hese controls are based on extensive due diligence of the environment of the business operations and all the stakeholders associated with it"; that "[a]ll due diligence follows a risk-based approach and is based on internal and external information and expertise"; and that "the anti-corruption programme provides comprehensive targeted training and communicates applicable policies to all Company employees."

34.    The 2015 Annual Report also touted Airbus's ethics and compliance organization, representing, in relevant part, that "[t]he Airbus Group Ethics and Compliance Programme ('the Airbus Group E&C Programme') seeks to ensure that the Group's business practices conform to applicable laws and regulations as well as to ethical business principles and thus establish a culture of integrity"; that "[t]here are two foundation documents in the Group E&C Programme," including the

"Standards of Business Conduct" and "Our Integrity Principles," which "summar[ize] the Group's 6 key Ethics and Compliance commitments and which was rolled out group-wide to each individual employee in 2013 by his / her manager"; that "[t]hose foundation documents are complemented by policies addressing specific topics and providing the necessary framework for Airbus Group to operate"; and that "[t]he Ethics and Compliance organisation is made of 5 pillars," including, among other safeguards, "the International Compliance Office [that] addresses corruption and bribery risks."

35.    In this same discussion, the 2015 Annual Report assured investors that, "[i]n light of regulatory investigations and commercial disputes, the Group has determined to enhance certain of its policies, procedures and practices, including Ethics and Compliance"; that "[t]he Group is accordingly in the process of revising and implementing improved procedures, including those with respect to its engagement of consultants and other third parties, in particular in respect of sales support activities, and is conducting enhanced due diligence as a pre-condition for future or continued engagement and corresponding payment"; and that "[t]he Group believes that these enhancements to its controls and practices best position it for the future, particularly in light of advancements in regulatory standards."

36.    In addition to representing that Airbus had robust anti-corruption, anti-bribery, ethics, and compliance systems in place, the 2015 Annual Report also

13

contained the generic, boilerplate representation that, "[a]lthough the Company seeks to comply with all such laws and regulations, even unintentional violations or a failure to comply could result in administrative, civil or criminal liabilities including significant fines and penalties . . . and could also have a significant adverse effect on the reputation of the Company." Plainly, the foregoing risk warning was a generic "catch-all" provision that was not tailored to Airbus's actual known risks regarding deficiencies in its anti-corruption program, much less that the Company was engaged in bribery to increase the Company's business.

37.   The statements referenced in ¶¶ 31-36 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that Airbus's policies and protocols were insufficient to ensure the Company's compliance with relevant anti-corruption laws and regulations; (ii) that, consequently, Airbus engaged in bribery, corruption, and fraud in order to enhance its business with respect to its commercial aircraft, helicopter, and defense deals; (iii) that, as a result, Airbus's earnings were derived in part from unlawful conduct and therefore unsustainable; (iv) the full scope and severity of Airbus's misconduct; (v) that resolution of government investigations of Airbus would foreseeably cost Airbus billions of dollars in settlements and legal fees

14

and subject the Company to significant continuing government investigation and oversight; and (vi) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

38.    On April 1, 2016, Airbus reported that it had discovered "certain inaccuracies" relating to U.K. export credit financing applications for customer airlines that could result in a disruption in funding.  The Company also disclosed that it had notified the relevant U.K. authorities of its findings, without identifying the nature of the problem.

39.    On this news, Airbus ADRs fell $0.34 per share, or 2.05%, to close at $16.21 per share on April 1, 2016, and Airbus foreign ordinaries fell $3.05 per share, or 4.48%, to close at $65.00 per share on April 1, 2016.  Despite these declines in Airbus's share value, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations concerning the full scope, severity, and consequences of Airbus's misconduct.

40.    On August 8, 2016, *Reuters* reported that the U.K. had opened a corruption probe into Airbus.  Specifically, the SFO announced that it had "opened a criminal investigation into allegations of fraud, bribery and corruption in the civil aviation business of Airbus," which "relate to irregularities concerning third party

15

consultants." The investigation followed Airbus's flagging of "misstatements and omissions" involving outside contractors in certain export financing applications to U.K. regulators and the European Export Credit Agencies earlier in the year, which the Company had found through an internal probe.

41.    On this news, Airbus ADRs fell $0.21 per share, or 1.49%, to close at $13.86 per share on August 8, 2016, and Airbus foreign ordinaries fell $0.82 per share, or 1.45%, to close at $55.58 per share on August 8, 2016. Again, despite these declines in Airbus's share value, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations concerning the full scope, severity, and consequences of Airbus's misconduct.

42.    For example, on February 22, 2017, Airbus issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2016. That press release reported, in relevant part:

> Group **revenues** increased three percent to € 67 billion (2015: € 64 billion). Revenues in Commercial Aircraft rose seven percent, reflecting the record deliveries of 688 aircraft (2015: 635 aircraft) and a favourable foreign exchange impact. Despite increased deliveries of 418 units (2015: 395 units), Helicopters' revenues were weighed down by an unfavourable mix and lower commercial flight hours in services. Defence and Space's revenues decreased nine percent, reflecting a negative impact from portfolio reshaping of about € 1 billion but were broadly stable on a comparable basis.

* * *

16

**Net income**[] totalled € 995 million (2015: € 2,696 million) after the EBIT Adjustments. It was also significantly impacted by negative foreign exchange effects. **Earnings Per Share** were € 1.29 (2015: € 3.43). The finance result amounted to € -967 million (2015: € -687 million).

43.     Thereafter, and prior to its Annual General Meeting, Airbus issued its Annual Report for the year ended December 31, 2016 (the "2016 Annual Report"). With respect to the SFO's investigation into GPT's activities in Saudi Arabia, the 2016 Annual Report contained substantively the same statements as referenced in ¶ 32, *supra*.

44.     With respect to the SFO's ongoing investigation into Airbus for suspected fraud, bribery, and corruption relating to irregularities concerning third party consultants, the 2016 Annual Report stated, in relevant part, that "[i]n the context of review and enhancement of its internal compliance improvement programme, Airbus discovered misstatements and omissions relating to information provided in respect of third party consultants in certain applications for export credit financing for Airbus customers"; that, "[i]n early 2016 Airbus informed the UK, German and French Export Credit Agencies ('ECAs') of the irregularities discovered"; that "Airbus made a similar disclosure to the [SFO]"; that, "[i]n August 2016, the SFO informed Airbus that it had opened an investigation into allegations of fraud, bribery and corruption in the civil aviation business of Airbus relating to irregularities concerning third party consultants (business partners)"; that "Airbus is

cooperating fully with the SFO"; and that "Airbus was subsequently informed that the French authorities, the [PNF], had also opened a preliminary investigation into the same subject and that the two authorities will act in coordination going forward."

45.     In addition, the 2016 Annual Report provided generic, boilerplate representations regarding how "[t]he SFO investigation and any enforcement action potentially arising as a result could have negative consequences for Airbus"; that "[t]he potential imposition of any monetary penalty (and the amount thereof) arising from the SFO investigation would depend on factual findings, and could have a material impact on the financial statements"; that, "at this stage it is too early to determine the likelihood or extent of any liability"; that "[i]nvestigations of this nature could also result in" multiple penalties, including "civil claims or claims by shareholders against Airbus," "adverse consequences on Airbus' ability to obtain or continue financing for current or future projects," "limitations on the eligibility of group companies for certain public sector contracts and/or . . . damage to Airbus' business or reputation via negative publicity adversely affecting Airbus' prospects in the commercial market place"; and that "[t]he Company may also be required to modify its business practices and compliance programme and/or have a compliance monitor imposed on it."  Plainly, these risk warnings were generic "catch-all" provisions that were not tailored to Airbus's actual known risks regarding the full scope and severity of Airbus's misconduct, much less that government

18

investigations would foreseeably subject Airbus to billions of dollars in settlement fees, significant continuing government oversight, or that the Company had been aware of red flags indicating bribery prior to such investigations.

46.     The 2016 Annual Report also assured investors that Airbus was properly remediating any deficiencies related to bribery and corruption, and had strengthened its ethics and compliance program, stating, in relevant part, that "Airbus has determined to enhance certain of its policies, procedures and practices, including Ethics and Compliance"; that Defendants "implemented an updated policy for the vetting of consultants engaged in sales support, to add a second layer of internal review and strengthen payment approval procedures"; that Defendants "issued a new Anti-Corruption Policy that summarises the prohibition against bribery and corruption for employees and other stakeholders, while providing an overview of the main elements of [Airbus's] anti-corruption compliance programme designed to mitigate this risk"; that Defendants "updated [Airbus's] policies relating to Gift & Hospitality and Sponsorship & Donations"; that Defendants "adopted a new policy related to Anti-Money Laundering"; that Defendants "develop[ed] new standardised processes and IT tools, to ensure that evaluation of compliance risk is more fully integrated into business decisions by management"; that "[t]he work to enhance [Airbus's] E&C programme will continue in 2017, not only in the area of Business Ethics/Anti-Corruption but across the Ethics and Compliance spectrum

more generally in order to capitalise on [Airbus's] values"; that, "[i]n 2016, the E&C organisation was renewed and strengthened"; that "[n]ew Division E&C Officers were appointed across the Group, and some former positions were merged into one single position . . . to enhance management of Business Ethics/ Anti-Corruption risk in particular"; that "the E&C community was reviewed entirely and made more efficient throughout Airbus"; and that, "[l]ike previous years, E&C was a top priority for the Company in 2016."

47.    The statements referenced in ¶¶ 38 and 42-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that Airbus's policies and protocols were insufficient to ensure the Company's compliance with relevant anti-corruption laws and regulations; (ii) that, consequently, Airbus engaged in bribery, corruption, and fraud in order to enhance its business with respect to its commercial aircraft, helicopter, and defense deals; (iii) that, as a result, Airbus's earnings were derived in part from unlawful conduct and therefore unsustainable; (iv) the full scope and severity of Airbus's misconduct; (v) that resolution of government investigations of Airbus would foreseeably cost Airbus billions of dollars in settlements and legal fees and subject the Company to significant continuing government investigation and

20

oversight; and (vi) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

48.     On March 16, 2017, Airbus issued a press release announcing that French authorities, the Parquet National Financier ("PNF"), had also opened a preliminary investigation into allegations of fraud, bribery and corruption in the civil aviation business of Airbus Group relating to irregularities concerning third party consultants, "and that the two authorities will act in coordination going forward."

49.     On this news, Airbus ADRs fell $0.29 per share, or 1.53%, to close at $18.61 per share on March 16, 2017.  Despite these declines in Airbus's share value, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations concerning the full scope, severity, and consequences of Airbus's misconduct.

50.     For example, on February 15, 2018, Airbus issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2017.  That press release reported, in relevant part:

> **Revenues** were stable at € 66.8 billion (2016: € 66.6 billion) with higher aircraft deliveries offset by a reduction in revenues of around € 2 billion from the perimeter changes. Commercial Aircraft revenues rose by 3.5 percent with record deliveries of 718 aircraft (2016: 688 aircraft) comprising 558 A320 Family, 78 A350 XWBs, 67 A330s and 15 A380s. Helicopters' revenues were slightly lower with deliveries of 409 units (2016: 418 units). Revenues at Defence and Space reflected

21

the Division's perimeter changes of around € 1.7 billion but were seven percent higher on a comparable basis driven mainly by military aircraft.

\* \* \*

**Net income**[] increased to € 2,873 million (2016: € 995 million) after the EBIT Adjustments with **earnings per share** of € 3.71 (2016: € 1.29). EPS also included a strong positive impact mainly from the revaluation of financial instruments and balance sheet items, reflecting the euro/dollar rate evolution as well as an adjustment on the A380 Refundable Launch Investment following a review of the commercial assumptions. The finance result was € 1,149 million (2016: € -967 million).

51.     Thereafter, and prior to its Annual General Meeting, Airbus issued its Annual Report for the year ended December 31, 2017 (the "2017 Annual Report"). With respect to the SFO's investigation into GPT's activities in Saudi Arabia, the 2017 Annual Report contained substantively the same statements as referenced in ¶ 32, *supra*.

52.     The 2017 Annual Report also contained substantively the same statements as referenced in ¶¶ 44-45, *supra*, regarding ongoing investigations into Airbus for suspected fraud, bribery, and corruption relating to irregularities concerning third party consultants, as well as plainly generic "catch-all" provisions regarding the potential consequences Airbus faced as a result of these investigations.

53.     The 2017 Annual Report additionally represented that Airbus "is cooperating fully with both [the SFO and PNF] including in respect of potential issues across Airbus' business"; that, "[a]s part of Airbus' engagement with the US

authorities, the latter have requested information relating to conduct forming part of the SFO/PNF investigation that could fall within US jurisdiction"; and that "Airbus is cooperating with the US authorities in close coordination with the SFO and PNF."

54.     The 2017 Annual Report also assured investors that "an anti-corruption programme has been put in place that seeks to ensure adequate identification, assessment, monitoring and mitigation of corruption risks," and that "[t]he Airbus Ethics and Compliance Programme seeks to ensure that the Company's business practices conform to applicable laws, regulations and ethical business principles, as well as developing a culture of integrity."

55.     The statements referenced in ¶¶ 48 and 50-54 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that Airbus's policies and protocols were insufficient to ensure the Company's compliance with relevant anti-corruption laws and regulations; (ii) that, consequently, Airbus engaged in bribery, corruption, and fraud in order to enhance its business with respect to its commercial aircraft, helicopter, and defense deals; (iii) that, as a result, Airbus's earnings were derived in part from unlawful conduct and therefore unsustainable; (iv) the full scope and severity of Airbus's misconduct; (v) that resolution of government investigations of

Airbus would foreseeably cost Airbus billions of dollars in settlements and legal fees and subject the Company to significant continuing government investigation and oversight; and (vi) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

56.     On December 20, 2018, media outlets reported that the U.S. had opened its own investigation into the subject of the SFO's and PNF's allegations of corruption against Airbus, "raising the stakes of probes already under way in Britain and France."

57.     On this news, ADRs fell $0.70 per share, or 2.87%, to close at $23.72 per share on December 20, 2018, and Airbus foreign ordinaries fell $3.20 per share, or 3.26%, to close at $95.00 per share on December 20, 2018.  Despite these declines in Airbus's share value, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations concerning the full scope, severity, and consequences of Airbus's misconduct.

58.     For example, on February 14, 2019, Airbus issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2018.  That press release reported, in relevant part:

> Consolidated **revenues** increased to € 63.7 billion (2017: € 59.0 billion(1)), mainly reflecting the record commercial aircraft deliveries. At Airbus, a total of 800 commercial aircraft were delivered (2017: 718 aircraft), comprising 20 A220s, 626 A320 Family, 49 A330s, 93 A350s

24

and 12 A380s. Airbus Helicopters delivered 356 units (2017: 409 units) with revenues stable year-on-year on a comparable basis despite the lower deliveries. Higher revenues at Airbus Defence and Space were supported by its Space Systems and Military Aircraft activities.

* * *

Consolidated **net income**[] of € 3,054 million (2017: € 2,361 million(1)) and **earnings per share** of € 3.94 (2017: € 3.05(1) ) included a negative impact from the financial result, mainly driven by the evolution of the US dollar and revaluation of financial instruments. The other financial result also included the positive adjustment of € 177 million from the A380. The finance result was € -763 million (2017: € +1,161 million(1)).

59.     Thereafter, and prior to its Annual General Meeting, Airbus issued its Annual Report for the year ended December 31, 2018 (the "2018 Annual Report"). With respect to the SFO's investigation into GPT's activities in Saudi Arabia, the 2018 Annual Report contained substantively the same statements as referenced in ¶ 32, *supra*.

60.     The 2018 Annual Report also contained substantively the same statements as referenced in ¶¶ 44-45, *supra*, regarding ongoing investigations into Airbus for suspected fraud, bribery, and corruption relating to irregularities concerning third party consultants, as well as plainly generic "catch-all" provisions regarding the potential consequences Airbus faced as a result of these investigations.

61.     In its discussion of ongoing investigations into Airbus for suspected fraud, bribery, and corruption, the 2018 Annual Report additionally downplayed Airbus's future liability by representing, in relevant part, that, "[i]n light of these

investigations, the Company enhanced certain of its policies, procedures and practices, including ethics and compliance and export control"; that "[t]he Company has revised and implemented improved procedures, including those with respect to its engagement of consultants and other third parties, in particular in respect of sales support activities"; and that "[t]he Company believes that these enhancements to its controls and practices will best position it for the future, particularly in light of advancements in regulatory standards."

62. The statements referenced in ¶¶ 58-61 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that Airbus's policies and protocols were insufficient to ensure the Company's compliance with relevant anti-corruption laws and regulations; (ii) that, consequently, Airbus engaged in bribery, corruption, and fraud in order to enhance its business with respect to its commercial aircraft, helicopter, and defense deals; (iii) that, as a result, Airbus's earnings were derived in part from unlawful conduct and therefore unsustainable; (iv) the full scope and severity of Airbus's misconduct; (v) that resolution of government investigations of Airbus would foreseeably cost Airbus billions of dollars in settlements and legal fees and subject the Company to significant continuing government investigation and

26

oversight; and (vi) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

63.     On January 27, 2020, before the markets closed, media outlets reported a potential settlement between Airbus and regulators in the U.S., U.K., and France related to the ongoing bribery and corruption probe into the Company, disclosing that the Company faced potentially billions of dollars in fines.  For example, the *Financial Times* reported that "[a]nalysts are forecasting fines of more than [3 billion Euros] to follow the complex negotiations."

64.     On this news, Airbus ADRs fell $1.14 per share, or roughly 3%, to close at $36.89 per share on January 27, 2020, and Airbus foreign ordinaries fell $6.17 per share, or 4.02%, to close at $147.13 per share on January 27, 2020.  Despite these declines in Airbus's share value, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations concerning the full scope, severity, and consequences of Airbus's misconduct.

65.     Thereafter, on January 31, 2020, media outlets reported that Airbus had agreed to a deal with U.S., U.K., and French prosecutors to settle bribery and export-control violations against the Company for €3.6 billion ($4 billion).  Pursuant to the settlement, Airbus also agreed to appoint an external compliance officer for at least

two years to monitor the Company's handling of its defense-related sales and disclosures.

66.    On this news, Airbus ADRs fell $0.72 per share, or 1.93%, to close at $36.68 per share on January 31, 2020, and Airbus foreign ordinaries fell $2.21 per share, or 1.48%, to close at $147.00 per share on January 31, 2020.  Again, despite these declines in Airbus's share value, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations concerning the full scope, severity, and consequences of Airbus's misconduct.

67.    For example, on February 13, 2020, Airbus issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2019.  That press release reported, in relevant part:

> Consolidated **revenues** increased to € 70.5 billion (2018: € 63.7 billion), mainly driven by the higher commercial aircraft deliveries and a favourable mix at Airbus, and to a lesser extent the favourable exchange rate development. A record 863 commercial aircraft were delivered (2018: 800 aircraft), comprising 48 A220s, 642 A320 Family, 53 A330s, 112 A350s and 8 A380s. Airbus Helicopters recorded stable revenues supported by growth in services, which offset lower deliveries of 332 rotorcraft (2018: 356 units). Revenues at Airbus Defence and Space were broadly stable compared to the previous year.

> * * *

> Consolidated reported **loss per share** of € -1.75 (2018 earnings per share: € 3.94) includes a negative impact from the financial result, mainly driven by the revaluation of financial instruments. The financial

result was € -275 million (2018: € -763 million). The consolidated **net loss**[] was € -1,362 million (2018 net income: € 3,054 million).

68.     Thereafter, and prior to its Annual General Meeting, Airbus issued its Annual Report for the year ended December 31, 2019 (the "2019 Annual Report"). With respect to the SFO's investigation into GPT's activities in Saudi Arabia, the 2019 Annual Report contained substantively the same statements as referenced in ¶ 32, *supra*.

69.     With respect to the U.K., French, and U.S. investigations into the Company's suspected fraud, bribery, and corruption relating to irregularities concerning third party consultants, the 2019 Annual Report represented, in relevant part, that, "[i]n 2016 . . . the Company announced that it had discovered misstatements and omissions in certain applications for export credit financing for Airbus customers, and had engaged legal, investigative and forensic accounting experts to conduct a review"; that, "[s]eparately, the SFO announced that it had opened a criminal investigation into allegations of fraud, bribery and corruption in the civil aviation business of the Company, relating to irregularities concerning third party consultants"; that "Airbus was subsequently informed that the French authorities, the PNF, had also opened a preliminary investigation into the same subject and that the two authorities will act in coordination going forward"; that "[t]he Company engaged with the government of the US ([Departments of State and Justice) relating to conduct forming part of the SFO/PNF investigation that could

29

fall within US jurisdiction"; that "[t]he Company also engaged with the government of the US concerning potential issues of [U.S. International Traffic in Arms Regulations] Part 130 and related matters"; and that, "[o]n 31 January 2020, the French and UK courts and US court and regulator approved an agreement reached by the Company with the authorities."

70.    The statements referenced in ¶¶ 67-69 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that Airbus's policies and protocols were insufficient to ensure the Company's compliance with relevant anti-corruption laws and regulations; (ii) that, consequently, Airbus engaged in bribery, corruption, and fraud in order to enhance its business with respect to its commercial aircraft, helicopter, and defense deals; (iii) that, as a result, Airbus's earnings were derived in part from unlawful conduct and therefore unsustainable; (iv) the full scope and severity of Airbus's misconduct; (v) that resolution of government investigations of Airbus would foreseeably cost Airbus billions of dollars in settlements and legal fees and subject the Company to significant continuing government investigation and oversight; and (vi) that, as a result, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Fully Emerges**

71.    On March 15, 2020, the *Wall Street Journal* reported that Airbus executives had previously raised red flags about fees paid to a number of middlemen working with its helicopter division, led at the time by Defendant Faury, that may have violated global bribery and corruption rules, citing internal documents related to Airbus's $4 billion bribery settlement in January, which were not previously made public and/or reported.   Specifically, the internal documents, submitted to investigators in the probe and reviewed by the *Wall Street Journal*, indicated that suspect helicopter deals were flagged for various reasons, with some middlemen payments appearing to executives as excessive compared with the underlying helicopter orders involved.   Others were allegedly flagged for what executives suspected was improper due diligence or lack of supporting paperwork. Additionally, Airbus executives allegedly made no final determinations about the propriety of the helicopter deals in the internal documents reviewed.

72.    On this news, Airbus ADRs fell $3.44 per share, or 15.71%, to close at $18.46 per share on March 16, 2020, and Airbus foreign ordinaries fell $7.97 per share, or 9.3%, to close at $77.75 per share on March 16, 2020.   Despite these declines in Airbus's share value, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of

31

Defendants' continued misrepresentations concerning the full scope, severity, and consequences of Airbus's misconduct.

73.     Thereafter, on July 30, 2020, the *Wall Street Journal* reported that the U.K.'s SFO had charged an Airbus subsidiary and three individuals with corruption in connection with a defense contract the country arranged with Saudi Arabia. Specifically, the *Wall Street Journal* reported, in relevant part:

> The U.K.'s major economic crimes investigator has charged an Airbus SE subsidiary and three individuals in connection with a defense contract the country arranged with Saudi Arabia.
>
> GPT Special Project Management Ltd.; former GPT Managing Director Jeffrey Cook; and John Mason, the partial owner of two GPT subcontractors, have jointly been charged with one count of corruption, the Serious Fraud Office said.
>
> * * *
>
> GPT, which ceased operations in April, was acquired by Airbus in 2007 from Ericsson AB on the recommendation of the Ministry of Defense. The subsidiary, whose sole customer was the Ministry of Defense, contracted for the design and operation of communications systems for the Saudi Arabian National Guard under a government-to-government agreement between the ministry and the SANG.
>
> A court hearing related to the charges is scheduled to take place in September, the SFO said.

74.     On this news, Airbus ADRs fell $0.67 per share, or 3.56%, to close at $18.13 per share on July 31, 2020, and Airbus foreign ordinaries fell $2.85 per share, or 3.8%, to close at $72.10 per share on July 31, 2020.

75.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Airbus securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

77.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Airbus securities were actively traded on the OTC.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Airbus or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

78.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Airbus;

- whether the Individual Defendants caused Airbus to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

34

- whether the prices of Airbus securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

82.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Airbus securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the OTC and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

35

- Plaintiff and members of the Class purchased, acquired and/or sold Airbus securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

83. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

84. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

85. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

86. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a

fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Airbus securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Airbus securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

88.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Airbus securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Airbus's finances and business prospects.

89.     By virtue of their positions at Airbus, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

90.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Airbus, the Individual Defendants had knowledge of the details of Airbus's internal affairs.

91.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Airbus. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Airbus's businesses, operations, future financial

condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Airbus securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Airbus's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Airbus securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

92.    During the Class Period, Airbus securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Airbus securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Airbus securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market

price of Airbus securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

93.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

95.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.   During the Class Period, the Individual Defendants participated in the operation and management of Airbus, and conducted and participated, directly and indirectly, in the conduct of Airbus's business affairs.  Because of their senior positions, they knew the adverse non-public information about Airbus's misstatement of income and expenses and false financial statements.

97.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Airbus's financial condition and results of operations, and to correct promptly any public statements issued by Airbus which had become materially false or misleading.

98.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Airbus disseminated in the marketplace during the Class Period concerning Airbus's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Airbus to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Airbus within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Airbus securities.

99.    Each of the Individual Defendants, therefore, acted as a controlling person of Airbus.  By reason of their senior management positions and/or being directors of Airbus, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Airbus to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised

control over the general operations of Airbus and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

100.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Airbus.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 6, 2020                              Respectfully submitted,

                                                    POMERANTZ LLP


                                                    */s/ Gustavo F. Bruckner*
                                                    Gustavo F. Bruckner
                                                    Jeremy A. Lieberman
                                                    (*pro hac vice* application forthcoming)
                                                    J. Alexander Hood II
                                                    (*pro hac vice* application forthcoming)
                                                    600 Third Avenue, 20th Floor
                                                    New York, New York 10016
                                                    Telephone: (212) 661-1100
                                                    Facsimile: (917) 463-1044
                                                    gfbruckner@pomlaw.com
                                                    jalieberman@pomlaw.com
                                                    ahood@pomlaw.com

                                                    POMERANTZ LLP
                                                    Patrick V. Dahlstrom
                                                    (*pro hac vice* application forthcoming)
                                                    10 South La Salle Street, Suite 3505
                                                    Chicago, Illinois 60603
                                                    Telephone: (312) 377-1181
                                                    Facsimile: (312) 377-1184
                                                    pdahlstrom@pomlaw.com

                                                    *Attorneys for Plaintiff*

43

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, Andrew J. Kornecki, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against Airbus SE ("Airbus" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Airbus securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Airbus securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Airbus securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Executed _____August 5, 2020_____**
                      **(Date)**


_____
                      **(Signature)**


___Andrew J. Kornecki___
               **(Type or Print Name)**